FILED
July 22, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____NM_____
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MARK SHURBET, § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL NO. SA-23-CV-1378-OLG |
| § | |
| ENERGY TRANSFER PARTNERS, § | |
| L.L.C., § | |
| § | |
| Defendant. § | |

# O R D E R

Pending before the Court is Defendant Energy Transfer Partners, L.L.C.'s ("Defendant") Motion for Summary Judgment (the "Motion for Summary Judgment") (Dkt. No. 25), to which Plaintiff Mark Shurbet ("Plaintiff") filed a response (the "Response") (Dkt. No. 28), and Defendant filed a reply (the "Reply") (Dkt. No. 30). For the reasons that follow, the Motion for Summary Judgment (Dkt. No. 25) is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

In 1999, Plaintiff began working at the Tilden Gas Plant in Tilden, Texas (the "Tilden Plant"). Dkt. No. 25-2 at 3. During the following years, ownership of the plant changed hands several times. *See id.* at 3–5. Eventually, Defendant acquired the Tilden Plant. *Id.* at 5. Defendant specializes in the transportation of natural gas and other products through pipelines. *See* Dkt. No. 25-1 at 2. To do so, Defendant maintains a team of gas controllers (the "Gas Control Group"). *Id.* The gas controllers remotely operate a series of compressor stations, thereby optimizing the flow of natural gas to customers. *Id.* They also act as "the first line of defense if something starts to go awry." *Id.* Indeed, if an issue arises at a compressor station, "alerts and alarms go off," signaling for the appropriate gas controller to resolve the issue or, if necessary,

"send out a crew to perform maintenance." *Id.* at 3. Failing to do so "can result in serious safety incidents, including fatalities." *Id.*

In June 2010, Plaintiff transferred from the Tilden Plant to the Gas Control Group in San Antonio, Texas. Dkt. No. 25-2 at 6. In 2015, Plaintiff's wife was diagnosed with fibromyalgia. Dkt. No. 28-1 at 19–20. Over the following years, she was diagnosed with several other serious medical conditions. *See id.* at 20–23. Plaintiff routinely discussed these conditions with his supervisors and co-workers. *See id.* at 23–30.

On November 12, 2021, Plaintiff missed an alert for a compression station and, as a result, failed to send a maintenance crew to address the issue. *See* Dkt. No. 25-3 at 52. Plaintiff's supervisor spoke with him regarding the seriousness of missing alerts. *Id.* Despite this conversation, Plaintiff missed another alert on December 14, 2021. *Id.* at 51–52. This time, Plaintiff received a final written warning based on his unsafe and unsatisfactory performance. *Id.* at 51. In his annual performance review, Plaintiff attributed both missed alerts to his wife's diagnosis with dysautonomia, a "fatal disease." Dkt. No. 28-2 at 5.

In August 2022, Skyler Day ("Mr. Day") took over as Plaintiff's supervisor. Dkt. No. 28-1 at 17. Around that time, Plaintiff began having attendance issues. *See* Dkt. No. 25-3 at 55. When he was late to work, Plaintiff offered a bevy of excuses unrelated to his wife's medical conditions. *See* Dkt. No. 25-1 at 3. As with his prior supervisors, Plaintiff regularly discussed his wife's medical conditions with Mr. Day. *See* Dkt. No. 28-1 at 29, 33–34, 50.

On September 27, 2022, Plaintiff was late for his shift. *See* Dkt. No. 25-3 at 55. The gas controller he was supposed to relieve contacted Plaintiff to get the "status of his whereabouts." *Id.* at 57. When Plaintiff finally arrived, he confronted the employee and told him not to "worry about what time he gets to work." *Id.* Mr. Day gave Plaintiff a warning for his unprofessional behavior

and excessive tardiness. *Id.* Plaintiff's punctuality improved for several months thereafter, but his attendance issues began again in early 2023. *See id.* at 55. On one of these occasions, Plaintiff called Mr. Day and told him that he would be late for work as a result of his wife's conditions. Dkt. No. 28-1 at 51. According to Plaintiff, Mr. Day responded by stating that "compassion has its limits." *Id.* Mr. Day disputes that he made this comment. *See* Dkt. No. 28-3 at 20.

On April 11, 2023, Mr. Day noticed that "issues were percolating" on a section of pipeline monitored by Plaintiff. Dkt. No. 25-1 at 3. Mr. Day attempted to contact Plaintiff for over an hour "to ask why he was not correcting the issue." *Id.* Because he was unable to reach Plaintiff, Mr. Day contacted another gas controller, Rodney Owens ("Mr. Owens"). *Id.* Mr. Owens told Mr. Day that Plaintiff was using a social media application on his cell phone. *Id.*

On April 12, 2023, the very next day, Plaintiff arrived more than an hour late to work. *See* Dkt. No. 25-3 at 55. According to Plaintiff, he attempted to call Mr. Day three times, but he did not answer. Dkt. No. 28-1 at 41–42. Because Plaintiff could not reach Mr. Day, he contacted Mr. Owens to request another gas controller to "cover for him." Dkt. No. 25-3 at 65; *see* Dkt. No. 28-1 at 41–42. A few hours later, Mr. Owens emailed Mr. Day to raise concerns about Plaintiff's attendance. *See* Dkt. No. 25-3 at 65. In that email, Mr. Owens suggested that, by contacting another gas controller, rather than his supervisor, Plaintiff appeared to be "hiding" his absence from Mr. Day. *Id.* During the remainder of his shift, Plaintiff was inattentive and repeatedly let his responsibilities fall "by the wayside." *See id.* at 62–63.

Later that afternoon, Mr. Day emailed a senior member of management, Steven Chambers ("Mr. Chambers"), regarding Plaintiff's "recurring pattern" of attendance and performance issues. *See* Dkt. No. 28-4 at 2–3. Mr. Chambers forwarded Mr. Day's email to a human resources manager, Raymond De La Vega ("Mr. De La Vega"). In that email, Mr. Chambers referenced

3

Plaintiff's pattern of attendance and performance issues, his excessive cell phone usage, in addition to "negative feedback" received from other gas controllers. *Id.* at 2. Mr. Chambers suggested that immediate termination was appropriate, but he welcomed feedback from Mr. De La Vega. *Id.*

On April 13, 2023, Mr. De La Vega and Mr. Day met with Plaintiff to discuss his performance and attendance issues. *See* Dkt. Nos. 25-7 at 9; 28-1 at 36–37. During their meeting, Plaintiff "denied using social media but admitted to missing alarms and being tardy." Dkt. No. 25-3 at 2. Plaintiff also suggested that "he was not getting enough rest because his wife was sick." Dkt. No. 25-7 at 10; *see also* Dkt. No. 28-1 at 37 (Plaintiff testified that he provided a "synopsis of what was going on" with his wife). At the end of their conversation, Plaintiff was suspended without pay while Mr. De La Vega investigated his alleged misconduct. *See* Dkt. Nos. 25-3 at 2; 25-7 at 11; 28-1 at 36–37.

On May 18, 2023, Mr. De La Vega and Mr. Day met with Plaintiff to inform him that he had been terminated. *See* Dkt. No. 28-1 at 46–47. The parties dispute the stated reason for his termination. Mr. De La Vega asserts that, because he could not "substantiate the social media allegation," Plaintiff was terminated for "unsatisfactory job performance." Dkt. No. 25-3 at 2; *see* Dkt. No. 28-6 at 2. According to Plaintiff, Mr. De La Vega told him that he was being terminated "due to being late, due to work performance, and for having been on social media during work hours." Dkt. No. 28-1 at 52.

**B.    Procedural History**

On May 25, 2023, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission. *See* Dkt. No. 25-5. On August 2, 2023, Plaintiff received a right to sue letter. *See* Dkt. No. 1-1. On October 31, 2023, Plaintiff initiated the instant lawsuit. *See* Dkt. No. 1. In his complaint, Plaintiff asserts associational

disability discrimination claims under the Rehabilitation Act (the "RA") and the Americans with Disabilities Act (the "ADA."). *See id.* at 4–5. Plaintiff also asserts interference and retaliation claims under the Family and Medical Leave Act (the "FMLA"). *See id.* at 6–7. On December 29, 2023, Defendant answered and asserted several state law counterclaims against Plaintiff. *See* Dkt. No. 3 at 16–18. On January 10, 2025, Defendant filed the Motion for Summary Judgment presently pending before the Court, wherein Defendant moves for summary judgment on all of Plaintiff's claims. Dkt. No. 25 at 5. On January 28, 2025, Plaintiff filed the Response. *See* Dkt. No. 28. On February 4, 2025, Defendant filed the Reply. *See* Dkt. No. 30.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the record—including depositions, documents, electronically stored information, affidavits or declarations, admissions, and interrogatory answers—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c). At this stage, the movant bears the burden of identifying those portions of the record it believes demonstrate the "absence of a genuine issue of material fact," *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)), or "pointing out 'the absence of evidence supporting the non[-]moving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).

If the movant meets its burden, the non-moving party must present specific facts that show "the existence of a 'genuine' issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)); *see also Lincoln Gen. Ins. Co.*, 401 F.3d at 349. The non-movant cannot create a dispute of fact with "conclusory allegations"

or "unsubstantiated assertions." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

"A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In considering the evidence presented, courts review the facts and inferences to be drawn from the record in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003) (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)). A court may not, however, "make credibility determinations or weigh the evidence," as those tasks are among those specifically reserved for the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (collecting cases).

### III. ANALYSIS

#### A. Associational Disability Discrimination

In his complaint, Plaintiff asserts two claims of associational disability discrimination, one under the RA and another under the ADA. *See* Dkt. No. 1 at 4–5. Because these statutes are "operationally identical," the Court considers both claims together below. *See Austin v. City of Pasadena*, 74 F.4th 312, 334 (5th Cir. 2023) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004)).

The Fifth Circuit has never "explicitly recognized a cause of action for discrimination based on association with a handicapped individual." *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 886 (5th Cir. 2020) (per curiam) (quoting *Spencer v. FEI, Inc.*, 725 F. App'x 263, 267 (5th Cir. 2018) (per curiam)) (internal quotation marks omitted). Nevertheless, the Fifth Circuit has acknowledged that, "if such an action were viable," the plaintiff would have to show the following elements to establish a prima facie case of discrimination:

> (1) his qualification for the job, (2) an adverse employment action, (3) the employer's knowledge of the employee's disabled relative, and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's adverse action.

*Id.* (citation modified). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of "establishing a prima facie case of discrimination." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the plaintiff does so, "then the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual." *Hartman v. Lafourche Par. Hosp.*, 262 F. Supp. 3d 391, 398 (E.D. La. 2017) (citation omitted).

Defendant challenges the fourth element of Plaintiff's prima facie case on the grounds that the circumstances surrounding his termination fail to "raise a reasonable inference that his wife's alleged disability was a determining factor in his termination." *See* Dkt. No. 25 at 16. Plaintiff disagrees. Plaintiff asserts that his supervisor, Mr. Day, harbored a "negative view towards Plaintiff being late because he had to assist his wife." Dkt. No. 28 at 10. In support thereof, Plaintiff identifies an exchange between himself and Mr. Day, during which Mr. Day chided Plaintiff for

7

being late for work. According to Plaintiff, Mr. Day told him that "compassion has its limits." *See* Dkt. No. 28-1 at 51. Thereafter, Mr. Day complained about Plaintiff's attendance and performance issues to Mr. Chambers, who ultimately terminated him. *See* Dkt. No. 28-4. Plaintiff argues that this evidence sufficiently demonstrates that Mr. Day's discriminatory animus led to his termination. *See* Dkt. No. 28 at 11.[1] The Court agrees with Defendant.

Mr. Day's disputed comment that "compassion has its limits" is immaterial because it gives rise to no inference that he harbored any discriminatory animus. *See Anderson*, 477 U.S. at 248. The only reasonable inference that may be drawn therefrom is that Plaintiff was terminated *despite* his wife's disability—not *because* of it. If anything, Mr. Day's comment suggests that he was *more* lenient with Plaintiff's absenteeism in light of his wife's conditions.

Plaintiff reaches the opposite conclusion by conflating attendance-based termination with association-based termination. *See* Dkt. No. 28 at 10. When an employee misses work to care for a disabled relative, the employer may terminate the employee based on that absence without giving rise to associational disability discrimination. That is so because "there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative." *Besser*, 834 F. App'x at 887 (quoting *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009)) (internal quotation marks omitted). In other words, while the law prohibits adverse employment actions motivated by an employee's

---

[1] The core of Plaintiff's argument is that Mr. Day's discriminatory animus may be imputed to Mr. Chambers, the ultimate decisionmaker, under the cat's paw theory. *See* Dkt. No. 28 at 10–11. Under this theory, "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the decisionmaker acted as a rubber stamp, or the cat's paw, for the subordinate employee's prejudice." *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (citation modified). Defendant objects to Plaintiff's reliance on this theory because he failed to raise it in his complaint. *See* Dkt. No. 30 at 5. For the purposes of its analysis, the Court assumes, without deciding, that Plaintiff properly invoked the cat's paw theory. In the Fifth Circuit, "a party need not include the proper label for a claim in their complaint so long as they plead each element of the claim that they are trying to bring." *Barron v. United States*, 111 F.4th 667, 673 (5th Cir. 2024). That is so because "a rose is a rose is a rose, even if you do not call it by that name." *Id.* (citation modified).

association with a disabled person, it does not prohibit adverse employment actions motivated by absences from work "occasioned by the association." *Erdman*, 582 F.3d at 510.

Construed in the light most favorable to Plaintiff, the evidence suggests that he was terminated for multiple reasons, including his poor record of attendance occasioned by his association with his ailing wife. Because such facts are insufficient to establish a prima facie case of associational disability discrimination, these claims must be dismissed.

**B.     Interference**

In his complaint, Plaintiff asserts a claim of interference under the FMLA. *See* Dkt. No. 1 at 7. To establish a prima facie case of interference, the employee "must show: (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA." *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 490 (5th Cir. 2018) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017)) (internal quotation marks omitted). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a prima facie case of interference. Once the plaintiff does so, "the burden shifts to the employer to articulate a legitimate reason for the employment action, which the employee can rebut by raising a genuine factual dispute over whether the employer's proffered reason was pretextual." *Way v. City of Missouri City*, 133 F.4th 509, 523–24 (5th Cir. 2025) (citing *Caldwell*, 850 F.3d at 245).

An employee need not state any "magic words" to provide proper notice of his intent to request FMLA leave. *See Bernard v. EDS Noland Episcopal Day Sch.*, 62 F. Supp. 3d 535, 545 (W.D. La. 2014) (citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 763–64 (5th Cir. 1995)). "The critical question is whether the information imparted to the employer is sufficient to

reasonably apprise it of the employee's request to take time off for a serious health condition." *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 842 (5th Cir. 2007) (quoting *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998)).

Defendant challenges the fourth element of Plaintiff's prima facie case. Specifically, Defendant asserts that Plaintiff never requested FMLA leave and, instead, merely discussed his wife's conditions with Mr. Day. Dkt. 25 at 20–21. Plaintiff disagrees. *See* Dkt. No. 28 at 14–16. According to Plaintiff, he told his supervisors, including Mr. Day, that his wife was diagnosed with several conditions and, as a result, frequently fell, suffered from chronic pain, and could not walk without a walker. Dkt. No. 28-1 at 29. Furthermore, Plaintiff asserts that he told Mr. Day that his wife was "becoming very needy and it was becoming harder and harder to care for her." *Id.* at 33. Indeed, Plaintiff told Mr. Day that he used paid time off to take his wife to the doctor. Dkt. No. 28-3 at 15. In early 2023, Plaintiff asserts that he called Mr. Day and told him that he would be late for work because of his wife's conditions. Dkt. No. 28-1 at 51. Plaintiff believes that this communication, taken in context, provided sufficient notice of his intent to request FMLA leave. *See* Dkt. No. 28 at 16.[2] The Court agrees with Defendant.

The Court finds *Lanier v. University of Texas Southwestern Medical Center*, 527 F. App'x 312 (5th Cir. 2013) (per curiam), instructive. In that case, Lanier served as a business analyst and,

---

[2] Plaintiff relies on two other statements from his deposition transcript to create a genuine issue of material fact with respect to this issue. *See* Dkt. No. 28 at 15. *First*, Plaintiff testified that, during his initial meeting with Mr. De La Vega, he provided a "synopsis of what was going on" with his wife. Dkt. No. 28-1 at 37. It is unclear what Plaintiff meant by "synopsis." According to Mr. De La Vega, Plaintiff told him that he "was not getting enough rest because his wife was sick." *See* Dkt. No. 25-7 at 12. Plaintiff fails to dispute Mr. De La Vega's characterization of their conversation, which was plainly insufficient to provide notice of his intent to request FMLA leave. *See* Dkt. No. 28. *Second*, Plaintiff testified that he asked to come in late due to his wife's health conditions. *See* Dkt. No. 28-1 at 53–54. It is unclear whether Plaintiff's testimony references his telephone call with Mr. Day or some other conversation. Based on his live complaint, Plaintiff appears to be referencing his call with Mr. Day. *See* Dkt. No. 1 at 3. As discussed below, Plaintiff's call with Mr. Day was insufficient to provide notice of his intent to request FMLA leave. At a minimum, both of Plaintiff's self-serving statements are too vague to raise a genuine issue of material fact. *See Allen v. Our Lady of the Lake Hosp., Inc.*, No. 22-30546, 2023 WL 3267840, at *5 & n.22 (5th Cir. May 5, 2023) (per curiam) (collecting cases).

in that role, "worked a day-time shift and participated in a rotating schedule of on-call duty." *Id.* at 314. Lanier's supervisor, Leary, knew that Lanier's father was ninety years old and in poor health. *Id.* at 317. One morning, Lanier told Leary that her father was experiencing "breathing problems." *Id.* Later that night, "Lanier sent a text message to Leary to inform him that her father was in the emergency room and that she would be unable to be on call that night." *Id.* at 315. A couple of weeks later, Lanier had an emotional outburst and left work suddenly, which Leary accepted as her resignation. *See id.* Lanier filed suit thereafter and asserted, among other causes of action, an FMLA interference claim. *Id.* at 316. Even though Leary knew Lanier's father was elderly and in poor health, had just experienced breathing difficulties, and was in the emergency room, the Fifth Circuit held: "No reasonable jury could conclude that the text message Lanier sent was sufficient to apprise Leary of her intent to request FMLA leave to care for her father." *Id.* at 317.

In the present case, Plaintiff discussed his wife's health conditions with Mr. Day on multiple occasions. *See* Dkt. No. 28-1 at 29, 33–34, 50. On the morning in question, Plaintiff told Mr. Day that he would be late for work because of those conditions. *See id.* at 51. But like *Lanier*, Plaintiff's telephone call provided inadequate information to apprise Mr. Day of his intent to request FMLA leave. *See Lanier*, 527 F. App'x at 317. The mere mention of the fact that Plaintiff was going to be late for work because he had to care for his ailing wife was insufficient, as a matter of law, to apprise Mr. Day of any purported request for FMLA leave. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 302 (5th Cir. 1999) (holding that an employee failed to properly request leave when he told his supervisor that "he might be suffering from bipolar disorder and needed time off to see a doctor" but never followed up on that conversation with a specific leave request); *Brown v. Atrium Windows & Doors, Inc.*, No. 13-cv-4819, 2015 WL 1736982, at *4–6 (N.D. Tex. Apr. 16,

2015) (finding an employee's email notification was insufficient where it appeared to be an excuse for tardiness and revealed no definite intention to take leave to care for the employee's hospitalized mother). Because Plaintiff has not met his burden of establishing a prima facie case of interference, this claim must be dismissed.[3]

### C. Retaliation

In his complaint, Plaintiff asserts a claim of retaliation under the FMLA. *See* Dkt. No. 1 at 6. To establish a prima facie case of retaliation, the employee must show that he engaged in an FMLA-protected activity. *See Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1002 n.2 (5th Cir. 2024) (citing *Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021)). As discussed above, Plaintiff provided insufficient notice of his intent to request FMLA leave. Thus, he cannot show that he engaged in a protected activity. *Id.* (citing *Harrelson v. Lufkin Indus., Inc.*, 614 F. App'x 761, 764 (5th Cir. 2015) (per curiam)). Accordingly, this claim must be dismissed.

### D. Supplemental Jurisdiction

With the dismissal of Plaintiff's federal claims, only Defendant's state law counterclaims remain pending. Defendant invokes supplemental jurisdiction as the jurisdictional basis for its counterclaims. *See* Dkt. No. 3 at 11. Under the supplemental jurisdiction statute, a district court may decline to exercise supplemental jurisdiction over state law claims if it "has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). "The Court may raise this issue sua sponte." *DOH Oil Co. v. Kahle*, No. 22-cv-58, 2023 WL 102150, at *16 (W.D. Tex. Jan. 4, 2023); *see Pierce v. Hearne Indep. Sch. Dist.*, No. 13-cv-334, 2014 WL 11308099, at *15 (W.D. Tex. June 19, 2014) (declining to exercise supplemental jurisdiction sua sponte after

---

[3] Plaintiff spends much of his briefing arguing that his statements should have triggered Defendant's internal FMLA policy. *See* Dkt. No. 28 at 14–16. Plaintiff is mistaken. Defendant's FMLA policy—like the FMLA itself—contemplates a request for leave paired with statements sufficient for Defendant to determine whether the request is covered by the FMLA. *See* Dkt. No. 28-7 at 2. As discussed above, Plaintiff's statements were plainly inadequate.

12

dismissing federal claims); *Torgerson v. Henderson County*, No. 21-cv-390, 2022 WL 3695492, at *5 (E.D. Tex. Aug. 1, 2022) (same), *R. & R. adopted*, 2022 WL 3691025 (E.D. Tex. Aug. 25, 2022).

In determining whether to exercise supplemental jurisdiction after dismissing all federal claims, district courts must consider the "common law factors of judicial economy, convenience, fairness, and comity." *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) (citing *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008)). Based on these factors, the Fifth Circuit has "elucidated the general rule that 'a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial.'" *Heggemeier v. Caldwell County*, 826 F.3d 861, 872 (5th Cir. 2016) (quoting *Brookshire Bros. Holding, Inc.*, 554 F.3d at 602).

While the present case has been pending for more than a year, significant resources have not been expended on this matter. The parties have engaged in minimal motions practice, and there are a total of thirty-five docket entries in this case, most of which are routine. Finding no reason to deviate from the general rule, and after carefully considering the common law factors, the Court declines to exercise supplemental jurisdiction over Defendant's state law counterclaims. *See, e.g., Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1465 (5th Cir. 1995) ("Although this case has been pending for three years and the parties were in the midst of trial preparation, the amount of judicial resources that were invested into this case . . . has been remarkably small. Since there has been no substantial commitment of judicial resources and the remaining claims can be routinely resolved, the district court did not abuse its discretion by remanding the remaining state claims to state court." (citation omitted)).

## IV.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Dkt. No. 25) is **GRANTED**.

**IT IS HEREBY ORDERED** that Plaintiff's associational disability discrimination claims under the RA and the ADA are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's interference and retaliation claims under the FMLA are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that, because the Court declines to exercise supplemental jurisdiction over Defendant's state law counterclaims, they are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that all other pending motions are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that this case is **CLOSED**.

**IT IS SO ORDERED.**

**SIGNED** this ____ day of July, 2025.

_____
ORLANDO L. GARCIA
United States District Judge